# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH LUCCHESI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DAY & ZIMMERMAN, | : | |
| GROUP, Inc., | : | |
| Defendant. | : | № 10-4164 |

## MEMORANDUM

PRATTER, J.                                                                                                                          NOVEMBER 16, 2012

### INTRODUCTION

Joseph Lucchesi brings three claims against his former employer Day & Zimmerman ("D & Z") relating to his termination: gender discrimination under the PHRA and Title VII and retaliation under Title VII. D & Z now moves for summary judgment as to each. Following oral argument, the Court determines to grant the motion.

### BACKGROUND

The following facts give rise to the Amended Consolidated Complaint in this matter, and they are presented in the light most favorable to Mr. Lucchesi.

Mr. Lucchesi was hired to work as an Infrastructure Specialist in D& Z's Information Technology ("IT") Department in April 1999. A little more than 8 years later, in the summer of 2007, D & Z hired Alicia Petruszka to work on the Development Team of the IT Department. Ms. Petruszka and Mr. Lucchesi had cubicles on the same floor, but did not have to pass each other's work spaces to get to the elevator or restrooms on that floor. The two occasionally communicated regarding work issues.

1

Mr. Lucchesi and Ms. Petruszka dated for a month or two in the summer of 2008. After their dating relationship ended, the two did have some social contact, most notably in December of 2008 when they socialized at a D & Z Christmas party and then later that month at a happy hour. Mr. Lucchesi testified that at the happy hour Ms. Petruszka was verbally abusive to him. However, when Ms. Petruszka called him that same night and asked him if she could stay at his house because she was too intoxicated to drive herself home from the train station, Mr. Lucchesi allowed her to do so; he picked her up at Suburban Station.

In January 2009, Mr. Lucchesi sent Ms. Petruszka somewhere between 20 and 50 emails. It is unclear from the record whether Ms. Petruszka actually responded to any of these emails, and those emails were not produced in discovery. Mr. Lucchesi testified that on April 17, 2009, Ms. Petruszka was verbally abusive to him and "caused a scene" at a happy hour. The next morning, Mr. Lucchesi sent Ms. Petruszka a lengthy and heartfelt email reminiscing about the history of their relationship. In it, he admitted that he "went over board [sic] with calling [her] and emailing [her]," noted that he had had "anxiety attacks" and was "breaking down again" as he wrote, apologized "if this is all too much" and for "[c]hasing after [her] last night," promised that he had changed, and acknowledged that she "let [him] have it" on more than one occasion and probably did not share his feelings and that he did not "expect it to turn things around." Def.'s Ex. 10.

Over a month later, on Saturday, May 30, 2009, Mr. Lucchesi sent Ms. Petruszka an email, saying, "I know you are no longer interested . . . I am reaching out to you because I am in a severe depressive state that I can't clear . . . Will you talk to me if I call you?" She did not respond, and later that night Mr. Lucchesi drove to Ms. Petruszka's house uninvited. When Ms.

2

Petruszka answered the door and saw who was there, she immediately slammed the door, saying something to the effect of "not in this lifetime." Mr. Lucchesi did not leave at that point, however. He remained outside her house and carried on an exchange of text messages as follows:

    Mr. Lucchesi (9:44 p.m.): "I was there for you that night, I just want to talk"

    Ms. Petruszka (9:57 p.m.): "I can't talk to you. Don't you have another friend you can talk to?"

    Mr. Lucchesi (10:00 p.m.): "I don't. Please talk to me. I know you aren't interested, I don't have to come inside. Just want to talk, nothing else. I need a 2 way conversation."

    Ms. Petruszka (10:03 p. m.): "I can't deal with this right now. You are freaking me out. Going to sleep."

    Mr. Lucchesi (10:04 p.m.): "Please don't be so cruel. I need to stop thinking about you all the time and if you would just talk to me like I was that guy that came to get you at suburban"

    Mr. Lucchesi (10:05 p.m.): "Tell me this will you ever deal with this directly to me? I am so beat up."

*See* Def.'s Ex. 9.

As this texting was going on, Ms. Petruszka contacted two of her co-workers, Bernard Greene (her Team Lead)[1] and Earl Paul, about the situation. Mr. Paul suggested that she call her

---

[1] Ms. Petruszka testified that she texted Mr. Greene, but that text was not produced in discovery, which Mr. Lucchesi noted in his response to D & Z's statement of undisputed facts. However, Mr. Lucchesi himself testified (and his emails bear out) that Mr. Greene called him that night and that when he called Mr. Greene back, Mr. Greene "wasn't happy with [him]." Mr. Lucchesi clarified at his deposition that the reason Mr. Greene was not happy with him was that Ms. Petruszka told Mr. Greene that Mr. Lucchesi appeared at her house that night; Mr. Greene told Mr. Lucchesi that Ms. Petruszka could go to Human Resources to report his conduct. Thus,

3

neighbor for help in getting Mr. Lucchesi to leave. Mr. Lucchesi then left after Ms. Petruszka's neighbor asked him to do so. Just after he left, he sent her another text message at 10:11 p.m., stating "I just left. I'm not sorry and I want to talk this week, face to face." He also emailed her at 12:51 a.m. on May 31, 2009, saying, "No matter what you say or do, I'm always going to have hope about us . . . However, I didn't drive out there about that. I drove out there hoping you might be more comfortable talking to me where you are safe . . . You can tell the world about this episode and it won't matter to me. So can we talk this week? . . . I'm the one that should be scared, not you." He again emailed at 2:41 a.m., asking Ms. Petruszka to "Please have a laugh about all of this. We are both cute and will be better friends again soon." On the afternoon of May 31, he sent one more email at 4:50 p.m., again asking Ms. Petruszka to talk to him and saying, "I knew I was going to continue to think about you today . . . I'm not going to lose out to you resigning to be on your own the rest of your life . . . I also know you can make someone (not just me) the happiest man in the world too." Def.'s Ex. 10.

On the morning of Monday, June 1, 2009, either Ms. Petruszka or Mr. Greene brought Mr. Lucchesi's behavior to the attention of D& Z's Human Resources Manager, Lisa Petrivilli.[2] Regardless of who initially brought the issue to her attention, Ms. Petrivilli did speak with Ms. Petruszka about Mr. Lucchesi that day. Although Ms. Petruszka confirmed that Mr. Lucchesi's behavior did not occur at work or using work email, she explained to Ms. Petrivilli that the two of them had dated in the past, that their dating relationship was over, that Mr. Lucchesi was

---

whether she texted him or communicated with him by some other means, it is clear that Ms. Petruszka contacted Mr. Greene that night.

[2] Ms. Petrivilli testified that Ms. Petruszka initiated the complaint, while Ms. Petruszka testified that Mr. Greene contacted HR originally. Mr. Lucchesi attempts to assign great significance to this distinction; this issue will be discussed in more detail below.

4

sending her emails and texts and had appeared at her home on Saturday night, and that she "just wanted him to stop."[3]  She also provided to Ms. Petrivilli the emails and text messages discussed above that Mr. Lucchesi sent to her during April and May of 2009.[4]  Ms. Petruszka mentioned Earl Paul as someone who may have information about the matter.

At some point, Ms. Petrivilli also spoke to Bernard Greene about the Petruszka complaint.[5]  Mr. Greene told Ms. Petrivilli that the two had dated, the relationship had ended, and that Ms. Petruszka was no longer interested in Mr. Lucchesi.  He also told her that he saw Mr. Lucchesi attempt to follow Ms. Petruszka after she left a happy hour gathering and that Ms. Petruszka had contacted him (Mr. Greene) over the weekend upset that Mr. Lucchesi had shown up at her house.  Ms. Petrivilli also met with Earl Paul, who told her that Mr. Lucchesi was still actively pursuing Ms. Petruszka and had shown up at her house the previous weekend.

Ms. Petrivilli also contacted John Harris, Mr. Lucchesi's supervisor to alert him to the

---

[3] Mr. Lucchesi calls this a disputed fact, but seems only to quarrel with who first approached Ms. Petrivilli; he does not cite any evidence that contradicts the list of things Ms. Petruszka told Ms. Petrivilli.  Indeed, one of Mr. Lucchesi's arguments is that Ms. Petrivilli treated him and Ms. Petruszka differently when she interviewed each of them.

[4] Mr. Lucchesi also contends that Ms. Petrivilli did not ask for any emails that Ms. Petruszka sent to Mr. Lucchesi or ask whether she had done anything to Mr. Lucchesi which he felt was unwelcome; he contends that this shows she prejudged the matter based on the gender of the two parties involved.  These observations raise arguments rather than set forth facts, however.

[5] Mr. Lucchesi objects that there is conflicting testimony as to Mr. Greene's role in the investigation and that his comments are inadmissible hearsay because they are drawn from Ms. Petrivilli's testimony.  Whether Mr. Greene reported the issue to Ms. Petrivilli, talked to her later as a witness, or both, there does not seem to be any reasonable dispute that Ms. Petrivilli talked to Mr. Greene, and that any statements made by Mr. Greene to Ms. Petrivilli are not submitted for the truth of the matter asserted, but rather for their effect on Ms. Petrivilli and her investigation.  He makes the same hearsay objection to information shared with Ms. Petrivilli by Earl Paul and Ed Bender and similarly does not provide any evidence to contradict the fact of their conversations with Ms. Petrivilli.  For the same reason, those statements are not hearsay, as they are not offered for the truth of the matters asserted.

ongoing investigation. Mr. Harris and Mr. Lucchesi had a good relationship and got along well at work. Mr. Harris, however, recommended that Ms. Petrivilli not meet with Mr. Lucchesi alone because he had a background of anger-related issues and a "very bad temper." Mr. Lucchesi had received a warning letter relating to an incident in which he was accused of behaving inappropriately toward a co-worker in 2005, and Mr. Harris had taken his supervisor, Ed Bender, with him to deliver the warning letter to Mr. Lucchesi because they were not sure how he would react to it. Ms. Petrivilli also spoke with Ed Bender, Mr. Harris's supervisor, about the issues raised, and Mr. Bender told her that Mr. Lucchesi had a bad temper and a history of outbursts at work.

Ms. Petrivilli spoke with her own supervisor, Heather Peters, about the matter, as well, and, based on Mr. Harris's recommendation, asked that Ms. Peters join her in speaking to Mr. Lucchesi. Ms. Peters agreed; she testified at her deposition that she had a typical practice of taking precautions when interviewing people, depending on the nature of the allegations and the interviewee, and that those precautions included sending more than one person to interview the subject of an investigation.

On June 3, 2009, Ms. Petrivilli asked Mr. Lucchesi to meet with her and Ms. Peters in Ms. Peters's office. She started the meeting by telling Mr. Lucchesi that she had seen the emails he sent Ms. Petruszka and knew he had been to her house on May 30; she then asked Mr. Lucchesi if he had any additional information he wanted to provide. Mr. Lucchesi was "not very forthcoming" at first because he felt that the matter was personal, but he also felt that he was not given the opportunity to fully explain his side of the story or to go over the emails and texts in question. He did explain that all of his personal contact with Ms. Petruszka had occurred outside

of work. He asked why he had to talk to two people about this, and Ms. Peters responded that she was the senior director of Human Resources and Ms. Petrivilli reported to her. Because he did not like the accusatory tone of the meeting, Mr. Lucchesi asked for the name of Ms. Peters's supervisor and was told that she reported to Silvana Battaglia. Ms. Petrivilli and Ms. Peters told Mr. Lucchesi not to call, text, or email Ms. Petruszka at work, and he agreed to comply. When Mr. Lucchesi asked why, Ms. Peters responded that Ms. Petruszka could get a restraining order against him. Mr. Lucchesi left the meeting unsure about whether he could continue to contact Ms. Petruszka outside of work.

Following the meeting, Mr. Lucchesi contacted Silvana Battaglia and requested a meeting about his concerns with Ms. Petrivilli and Ms. Peters's treatment of him. They met on June 4, 2009, after Ms. Petrivilli had reported to Ms. Battaglia about the investigation and informed her that Human Resources was planning to issue a written warning to him. At the meeting, Mr. Lucchesi said that he did not like Ms. Peters's tone (including when she said that Ms. Petruszka could get a restraining order against him), that he felt he should have been interviewed earlier in the process, and that he wanted to know why two people had interviewed him. Ms. Battaglia responded that they thought he would be too "intimidating" for Ms. Petrivilli to interview alone. Mr. Lucchesi also expressed that he felt he had been treated differently from Ms. Petruszka during the investigation.[6] Ms. Battaglia asked Mr. Lucchesi for the "whole story" regarding his

---

[6] Mr. Lucchesi also claims he said he felt he was being subjected to a "hostile environment," but the only evidence to which he cites is the Complaint, despite the fact that he was deposed and submitted an additional affidavit in support of his opposition, neither of which contain evidence of this statement. Mr. Lucchesi may not rely on complaint allegations at the summary judgment stage to create a dispute of fact, but must support his factual contentions by citation to the record. *See* Fed. R. Civ. P. 56(c)(1).

interactions with Ms. Petruszka, and he shared his version of the events, including Ms. Petruszka's verbal abusiveness in the past, noting that "she gets off so easily." At some point during the conversation, Ms. Battaglia commented that Mr. Lucchesi was "stalking" Ms. Petruszka.

As the meeting ended, Ms. Battaglia asked Mr. Lucchesi if he would still walk by Ms. Petruszka's cubicle, and he responded, "What difference does that make? I don't tip toe around." When she asked whether he would still communicate with Ms. Petruszka, he expressed that he did still wish to be friends with her and that he would talk to her outside of work if he saw her. When she asked whether he understood the severity of the allegations against him, he became emotional and asked Ms. Battaglia to let him talk to Ms. Petruszka.[7] More specifically, during the meeting, Mr. Lucchesi had tears in his eyes, his hands shook, and he vacillated from angry to sad to indignant throughout the meeting.[8] Mr. Lucchesi asked what would happen next, and Ms. Battaglia told him that a reprimand would be drafted, to which Mr. Lucchesi responded that he would have to have any reprimand legally reviewed. Mr. Lucchesi did bring a highlighted copy of the D & Z harassment policies with him, but there is no evidence that he and Ms. Battaglia specifically discussed the document or Mr. Lucchesi's reason for bringing it. Moreover, while Mr. Lucchesi did complain that he was being treated differently, he did not say that he felt he was being treated differently because he is a man.

Ms. Battaglia followed up by meeting with Ms. Petruszka. Ms. Battaglia asked Ms.

---

[7] Mr. Lucchesi does not dispute that he became emotional or asked to speak to Ms. Petruszka, but he does dispute the "inferences to be drawn therefrom." Once more, this is not a dispute of fact, but an argument as to the significance or weight of that fact.

[8] Again, Mr. Lucchesi does not dispute that he exhibited these emotions, but he does dispute the "inferences to be drawn therefrom."

Petruszka if she had asked Mr. Lucchesi to stop contacting her, and Ms. Petruszka said that she had.[9] She also reviewed the emails and texts that Ms. Petruszka forwarded to Ms. Petrivilli. Afterwards, she called Anthony Bosco, the Senior VP and CIO, and told him that she had a "very concerning" conversation with Mr. Lucchesi, that the conversation was irrational, and that she was consequently concerned for the safety of D & Z's employees. They spoke in person the next day, at which point Ms. Battaglia informed Mr. Bosco that her conversation with Mr. Lucchesi was "scary" and that she did not believe that he would leave Ms. Petruszka alone or that he understood the severity of the issue. At the time he spoke with Ms. Battaglia, Mr. Bosco believed that Mr. Lucchesi had a reputation for being volatile and stubborn.[10]

By the following Monday, Mr. Bosco made the decision to terminate Mr. Lucchesi based on Ms. Battaglia's report and recommendation to Mr. Bosco. Ms. Battaglia relayed this to Ms. Petrivilli, adding that the decision was made because she did not believe that Mr. Lucchesi would stop contacting Ms. Petruszka.[11] Ms. Petrivilli and Mr. Harris then met with Mr. Lucchesi, and Ms. Petrivilli told him that he was being terminated because D & Z was not confident that he would leave Ms. Petruszka alone or not walk past her cubicle.

---

[9] Mr. Lucchesi tries to raise a dispute as to whether Ms. Petruszka actually did tell him to leave her alone, and claims that no emails or texts produced in discovery support this fact. However, he does not introduce any evidence to contradict the fact that Ms. Petruszka told Ms. Battaglia that she had asked him to leave her alone, whether or not Ms. Petruszka was actually telling the truth.

[10] Mr. Lucchesi calls this information inadmissible because Mr. Bosco's testimony about Mr. Lucchesi's reputation was hearsay. Again, the testimony is not being offered for the truth of the matter asserted – whether Mr. Lucchesi was actually volatile and stubborn – but for Mr. Bosco's state of mind.

[11] Mr. Lucchesi argues that he was never told to leave Ms. Petruszka alone outside of work and that he had agreed to not contact her at work. At any rate, that does not negate that Ms. Battaglia said this to Ms. Petrivilli.

Mr. Lucchesi later filed discrimination charges with both the EEOC and PHRC; after receiving right-to-sue letters, he initiated this lawsuit. D & Z moved to dismiss his complaint for failure to state a claim; the Court denied the motion in most respects, although it did grant the motion as to his PHRA retaliation claim, which Mr. Lucchesi conceded was filed too late. D & Z now moves for summary judgment on the remaining claims.[12]

**LEGAL STANDARD**

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record." Fed R. Civ. P.

---

[12] To the extent that Mr. Lucchesi asserted that D & Z engaged in retaliatory conduct after his termination, he has withdrawn that portion of his claim. Thus, the Court will not address that portion of the claim in either the factual background or legal analysis.

10

56(c)(1). "The Court need consider only the cited materials" when determining whether there exists a genuine issue of material fact for trial. Fed R. Civ. P. 56(c)(3). If the cited evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

**DISCUSSION**

### A. Gender Discrimination Claims

To establish a *prima facie* case of discrimination under either Title VII or the PHRA,[13] a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subject to an adverse employment action, and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action. *Serullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff can set forth a *prima facie* case, the defendant must proffer a legitimate, non-discriminatory reason for the adverse action; faced with a legitimate, non-discriminatory reason, a plaintiff then bears the burden of showing that the reason is a mere pretext for discrimination, either because he has introduced evidence that would lead a jury to disbelieve the defendant's reason or to believe that discrimination was more likely than not a motivating or determining cause of the adverse action. *Fuentes v. Perskie*, 32 F.3d

---

[13] "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006).

11

759, 763 (3d Cir. 1994).

D & Z first argues that Mr. Lucchesi's PHRA and Title VII discrimination claims fail because he cannot even set forth a prima facie case of discrimination. The evidence that Mr. Lucchesi sets forth in support of an inference of discrimination is (1) that he was treated differently from a "similarly situated" female employee, Ms. Petruszka, in that HR credited her word over his, (2) that Ms. Peters told him that Ms. Petruszka could get a restraining order against him, and (3) that the overall "investigation" was unfair.[14]

D & Z contends that Ms. Petruszka was not similarly situated to Mr. Lucchesi, such that any inferences of discrimination can be drawn from different treatment accorded to the two employees. A similarly situated individual must be "similar in all relevant aspects" in order to support an inference of discrimination; factors to be considered include, for instance, that they dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220, 222-23 (3d Cir. 2009). Ms. Petruszka, D & Z argues, did not engage in conduct similar to Mr. Lucchesi – she reported a problem with a co-worker, had no reputation in the

---

[14] Mr. Lucchesi concedes that the presence of two HR employees at his interview does not raise an inference of discrimination in this case, although he still argues that it provided him with reasonable grounds to complain of discrimination to Ms. Battaglia, in the context of his retaliation claim.
    Mr. Lucchesi also mentions that Ms. Battaglia accused him of "stalking" Ms. Petruszka, but, unlike as to Ms. Peters's comment about restraining orders, he does not appear to argue that this statement is evidence sufficient to raise an inference of gender bias. Even if he were to do so, the analysis that applies to the restraining order comment applies equally to a comment about stalking, even though Ms. Battaglia was much closer to being a decision-maker than Ms. Peters was.

workplace of volatility, and was not accused of inappropriate conduct. It cites a number of cases which stand for the general proposition that accused and accusers are not similarly situated for purposes of establishing a prima facie case of discrimination. *See, e.g., Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1160 (9th Cir. 2010) (holding that male pilots were not similarly situated to female flight attendants, when a female flight attendant levied harassment charges against pilots despite engaging in similar behavior herself; while the men were affirmatively accused of harassment, the only time the women's behavior was raised was in response to those charges); *Glenn v. Raymour & Flanagan*, Civ. A. No. 10-CV-816, 2011 WL 6739461 (E.D. Pa. Dec. 22, 2011) (no *prima facie* case when African-American employee who threatened white co-worker was terminated but white co-worker was not, even though the co-worker made a racist comment; white co-worker reported the conduct); *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp. 2d 206 (E.D. Pa. 2010) (granting motion to dismiss because allegations in the complaint did not demonstrate that an employee accused of sexual harassment/stalking was similarly situated with his accuser).

    Mr. Lucchesi counters that the two are similarly situated because Mr. Greene, not Ms. Petruszka, made the complaint and because when he spoke to Ms. Battaglia, he reported inappropriate conduct in which Ms. Petruszka engaged, i.e., her verbal abuse of him on two occasions. He points to no case law involving similar facts. Indeed, this interpretation of the facts severely stretches the truth of the matter. Whether Ms. Petruszka was the *first* person to report the behavior to HR or not, she did speak with HR about the matter and expressed that she wanted Mr. Lucchesi to leave her alone, and she did raise the issue with Mr. Greene, her immediate supervisor. To call her similarly situated or characterize her as a mere interviewee

13

rather than a complainant would create a dangerous precedent – for many reasons, a victim of harassment in the workplace may not always be the first person to bring the harassment to an employer's attention.

Moreover, to the extent Mr. Lucchesi argues that they are similarly situated because he made complaints about Ms. Petruszka that were just as serious as those raised against him, according to the record presented to the Court, Mr. Lucchesi never expressed that he wanted Ms. Petruszka to leave him alone because of it, and verbal abuse on two occasions is easily distinguished from Mr. Lucchesi's behavior in showing up at Ms. Petruszka's house uninvited, refusing to leave until a neighbor got involved, and sending emails despite acknowledging that his attentions were unwanted.

Mr. Lucchesi next argues that Ms. Peters's comment about restraining orders raises an inference of gender discrimination because he believes that more restraining orders are granted against men in favor of women than the reverse and because Ms. Peters stated at the meeting that she had not read the emails or texts Ms. Petruszka received and therefore could not have based her statement on anything aside from gender bias. He provides the Court with no statistical evidence concerning restraining orders and the gender of those restrained by them, nor does he present any evidence that a discriminatory connotation is commonly attached to the term "restraining order," apart from his own belief, or that Ms. Peters referred to his gender at any time in the context of making her statement.

Mr. Lucchesi also contends that Ms. Peters's comment is a reflection of the investigation as a whole, which he believes was discriminatory, in that D & Z rushed to judgment by relying on gender stereotypes. He points to Ms. Petrivilli's deposition statement that D & Z never

"truly" investigated the situation. D & Z, however, argues that simply rushing to judgment or performing an inadequate investigation, without evidence that the rush was based on gender, is not enough to support a gender discrimination claim. *See, e.g., Money v. Provident Mut. Life Ins. Co.*, 189 Fed. Appx. 114, 117 (3d Cir. 2006) (summary judgment appropriate, as plaintiff's "naked credibility attack" on employer's investigation was insufficient to support an inference of discrimination based on race or age); *Geddis v. Univ. of Delaware*, 40 Fed. Appx. 650 (3d Cir. 2002) (even if allegations against plaintiff were false, employer's reliance on those allegations is not evidence of discriminatory bias without other evidence). The Court agrees.

Mr. Lucchesi offers no other evidence that men were treated differently by D & Z or that he was ever discriminated against based on his gender in the past. As D & Z points out, to hold that he established a *prima facie* case based on these facts is tantamount to assuming that there is a jury question any time one employee complains to management about the behavior of an employee of another protected class and management acts on that complaint. Moreover, because Mr. Lucchesi cannot even set forth a *prima facie* case of discrimination, the Court need not even address whether he can overcome D & Z's proffered legitimate nondiscriminatory reason for terminating him. Therefore, the Court will grant D & Z's motion as to Mr. Lucchesi's Title VII and PHRA claims alleging gender discrimination.

    **B.**    **Retaliation Claim**

Originally, Mr. Lucchesi argued that D & Z retaliated against him both before and after his termination. He has now conceded that he has no claim based on any conduct that occurred after he was terminated, so his retaliation claim is solely based on his argument that he was fired because he told Ms. Battaglia that he was subject to discriminatory treatment in his meeting with

Ms. Peters and Ms. Petrivilli. However, he admitted at his deposition that he did not tell Ms. Battaglia that he felt he was being discriminated against *based on his gender*, just that he was being treated differently than Ms. Petruszka. The Third Circuit Court of Appeals has made clear that general complaints of unfair treatment cannot support a retaliation claim – the complaint must include some mention of a protected class or conduct to serve as the basis for such a claim. *See, e.g., Barber v. CSX Distribution Servs.*, 68 F.3d 694 (3d Cir. 1995). Mr. Lucchesi argues that because he said he was being treated differently and said he felt he was subject to a hostile work environment, Ms. Battaglia, as a seasoned HR professional, should have known he was complaining of gender discrimination. However, there is no competent evidence that he referred to a hostile work environment, as noted above, and Mr. Lucchesi clearly testified that he did not tell Ms. Battaglia that he thought he was being treated differently because of gender:

> Q: And when you said treated differently, did you specifically say to Ms. Battaglia that you believed you were being treated differently because you were a male or just that you were being treated differently?
>
> A: That I was being treated differently.

Def.'s Ex. 1, Lucchesi Dep. 220-221. Thus, based on clear precedent, the retaliation claim fails as well.

**CONCLUSION**

For the foregoing reasons, the Court will grant D & Z's Motion in its entirety. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE